1    ERNESTO D. AND DIANA B. ADAMOS          FILED

     **Name and Address**

2    783 GREENLEAF DR.                       AUG 2 3    3

3    BRENTWOOD, CA. 94513            RICHARD W. WIEKING
                                     CLERK, U.S. DI
4                                    ...ERN DIST?

5              **UNITED STATES DISTRICT COURT**

6              **NORTHERN DISTRICT OF CALIFORNIA**

7

8                                  )    Case No. _____ 4116, CV08, WHA
                                   )
9    ERNESTO AND DIANA ADAMOS       )
                                   )
10        **Plaintiff / Petitioner**    )    **Document Name:**
                                   )
11              **VS.**                )
     RODERICK ARCE                  )    EXHIBIT TO HABEAS
12   DANIEL BIBLE                   )
     US ATTY. GENERAL MICHAEL       )    CORPUS PETITION
13                      MUKASEY     )
14        **Defendant / Respondent**    )    _____

15   _____

16

17

18

19

20

21

22

23

24

25

26

27

28



## TABLE OF CONTENTS

1. Letter To The Honorable Condoleeza Rice

2. Copy of Oath of Allegiance

3. Copy of Ernesto Adamos, Sr. proof of US Federal Service from the US Office of Personnel Management

4. Copy ofErnesto Adamos, Sr. retirement letter from the Department of the Navy signed by Captain D.W. McKinnon, Jr.

5. Parents' marriage contract during the commonwealth of the Philippines

6. US Passport of Severina Dominguez Adamos

7. Picture of US Naval Reservation Police force In Olongapo, taken on Aug ust 17, 1949

8. Copy of Driver License of Ernesto D. Adamos, Jr.

9. Ernesto Adamos, Jr. passport

10. Certification of attendance from St. Joseph's School during the US Outlying Possession of Olongapo in the Philippines

11. Primary school certificate, dated 1956

12. Elementary curriculum certificate, dated 1959

13. The Olongapo Story

14. Copy of the Philippine Independence Act (Tydings-McDuffie Act)

15. 8 C.F.R. Part 325 – Nationals but not citizens of the United states

16. 7 FAM 1140 Acquisition of Noncitizen U.S. Nationality By Birth Abroad

17. Title 8 chapter 12 subchapter III part I section 1408

18. Title 8 chapter 12 subchapter III part I section 1401 _



~~June 27, 2007~~

The Honorable Condoleeza Rice
Secretary of State
U.S. State Department
2201 C Street NW
Washington, DC 20520

Dear Secretary Rice,

  For years I have been reluctant to start my petition due to the uncertainty of the consequence that it might provide. Especially to other people if a precedent would be established that could be beneficial or harmful for both the people and the governments that may have concern with, after a decision has been made on the result of my action.

  But then, after serious consideration of the matters that I think were important, it came to a basic conclusion that it is best for me to pursue this quest, regardless of the outcome, in order to put this matter behind me and so may others, that might have had the same experience in a tiny town formerly called, *Olongapo, Subic Bay* (pronounced as olong-ga-po, soo-bic bay), in the former Philippine Islands, which is now the Republic of the Philippines. And not to feel responsible or guilty for a possible unfavorable effect from the result of my petition. And lastly, to be able to start putting part of my life's attention on someting else when this subject has been resolved.

  So at this point Madam Secretary, may I honestly say that I humbly and honorably petition for an issuance of a US National Certificate on my behalf. And I respectfully submit the following facts and declare that they are true and correct to the best of my knowledge.

  (1) My name is Ernesto D. Adamos, Jr., son of a retired US federal employee. I was born a US National, if not US Citizen, in the formerly called Philippine Islands on November 28, 1945, during the Commonwealth of the Philippines. Almost eight months after my birth the Philippines gained its independence from the United States and became a republic on the 4th of July 1946.
*7 FAM 1140*
*7 FAM 1141 C*
*7 FAM 1142 Chart*

  (2) My parents, Mr. Ernesto R. Adamos *Sr.* and Mrs. Severina Dominguez Adamos were both US Nationals, if not US Citizens. Their US nationality were acquired during their birth in the 1920's when the Philippines was a territory, possession or an outlying possession and under the jurisdiction of the United States.
*Treaty of Paris 1898*
*Title 8 Chapter 12 Subchapter III Part I Section 1408*

  (3) My Dad Ernesto R. Adamos, *Sr.*, a US federal retiree, had served the US Naval Base, Subic Bay for 41 years in a civilian capacity. *( US Civil Service Claim No. CSA 2481569, Office of Personnel Management, Civil Service Retirement System, Washington, DC 20415*

  (4) With the exceptions of "*Olongapo*," ( pronounced as olong-ga-po ) a small town in Subic Naval station, and the US Naval Station itself, the Republic of the Philippines attained its full independence from the United States on July 4th 1946. In the same written provisions of *The Philippine Independence Act* also known as the *Tydings-Mcduffie Act of 1934*; *Section 5,10(a)*. Olongapo and the US Naval Station were **both not granted and excluded by** the President of the United States as stipulated in the said Act. Olongapo and the US Naval Station

remained a territory and an outlying possession of the United States.
*http://www.chanrobles.com/tydingsmcduffieact.htm*
*Tydings-Mcduffie Act of 1934, Section 5, 10(a).*

(5) My parents and I were inhabitants of "*Olongapo*", a town that was part of the US Naval Station from 1901 to 1959, and was governed and administered by US personnel. During this time, the Commanding Officer of the Naval Station appoints a Reservation Officer who then acts as Town Mayor. The Reservation Officer appoints Town Council and Reservation Police. My father resided in this town since birth and my mother since she was twelve. This was a gated town and guarded at checkpoints by US servicemen. Visitor's pass was required for each non-resident to visit the town. Residents adapted to the American way of life. American flag waves on schools' flag poles and Philippine flag half raised, and so as on some public and private institutions' flag poles. I sing the Star Spangled Banner every school flag ceremony in the morning followed by Philippine National Anthem. School, sports, food, environment, family values, political and religious beliefs are almost all American way. This was a unique and the only kind of town in the Philippines that it was also once said, **"Olongapo was a transplanted piece of American mainland at the US Naval Station where the US Navy has not found an entirely alien land"**.
*http://www.subicbaypl.com/sub_stories_olongapostory.htm*
*http://subicbaypl.comsub_pho_dur006.htm*
*Subic Bay History-Chapter 7. After the War*

(6) On December 7, 1959 when I was 14 years old, without a plebiscite, Olongapo was transfered to the authority and jurisdiction of the Philippine Government. Only the US Naval Station remained under the jurisdiction of the United States. The turnover and transition period brought feelings of loss, sadness, and insecurity to the inhabitants. Visitor's pass was no longer required.

(7) I tried to be enlisted with the US Military after graduation from high school but was told I did not pass the exam.

(8) Though I helped and campaigned for some candidates, I never voted in a local or national elections, not even once. I don't know why and how did this unintentionally happen.

(9) Like my parents, it is engrained in my mind that I Owe a Permanent Allegiance to the United States. In my astonishment, my belief and feelings were justified  when I saw and read a pre-conditioned provision in one of the Mandatory provisions of The Philippine Independence Act of the Tydings-Mcduffie Act, prior to the drafting of the Philippine Commonwealth Constitution. In the **Charter of the Constitution-Mandatory Provisions Section 2(a) (1), (2) states that "all citizens of the Philippine Islands Shall Owe Allegiance to the United States".**
*http://www.chanrobles.com/tydingsmcduffieact.htm*
*Charter of the constitution-Mandatory provisions Section 2(a) (1), (2)*

(10) Constitutional or not, the Tydings-Mcduffie Act of 1934 revoked the US citizenship of the Filipinos and treat the Filipinos as aliens after the Philippine Independence on July 4, 1946. But, the inhabitants and the tiny town of Olongapo remained under the protection and jurisdiction of the United States of America. Olongapo and the US Naval Station stayed an outlying possession of the United States even after the Philippine Independence  on July 4, 1946.
*Tydings-Mcduffie Act of March 24, 1934; Section 5, 10(a)*
*http://www.chanrobles.com/tydingsmcduffieact.htm*

(11) On December 7, 1959, during the turnover of the town from the United States' authority to the Philippine government, it was too late for the Philippine government to claim me as theirs.I was already raised and molded an American and a US national, if not a US citizen. To justify this claim, I enclosed some saved related documents and attest the following brief statements.

(a) both my parents were US nationals, if not US citizens, when I was born
   **Treaty of Paris 1898**
   **INA Title 8 Chapter 12 Subchapter III Part I Section 1408**
   **INA Title III Section 308**

(b) I was born a US national on November 28,1945 during the Philippine
   Commonwealth (before the Philippine Independence on the 4th of July 1946)
(c) my Dad and Mom were residents of the outliying possession of the United States
   continouosly for 59 and 47 years respectively, in *Olongapo, Subic Bay*
(d) my US national parents were not outside the outlying possession of the US for
   continuous period of more than two months
(e) my Dad already had 16 years of US Federal Service during the 1959 turnover of
   this town from US to the Philippine government, totalled to 41 years of service in
   1981 during his retirement
(f) I Owe Permanent Allegiance to the US
(g) I spent 14 years of my life in the outlying possession of the US (1945-1959)
(h) I tried to join the US Military Service at Sangley Point but I failed the examination;
   tried also to join at the mobile recruitment office in New Haven, Connecticut, but
   lack of US resident papers disabled me to join
(i) I never voted in the Philippines
(j) at present I have been living in the US continuously for almost 21 years
(k) a copy of my Oath of Allegiance is enclosed
(l) good moral character
(m) proof of birth date on my passport
(n) copy of my parents' original marriage contract during the Commonwealth
(o) copy of my Mom's US passport
(p) copy of my Dad's proof of service with the US Naval Base, Subic Bay
(q) copy of my school certificates during the US's outlying possession of Olongapo
(r) character reference and employment history record at Stanford Hospital and elsewhere
will be available upon request

(12) My Dad inspired and urged me to claim my US nationality so we can start settling here
in the US along with my Mom. In1989, two years after my last arrival in the US, my Dad passed away
after suffering from a severe stroke that he had shortly after his retirement in 1981. We were not able
to experience the life in the mainland United States together with my Dad. My Mom became a US
citizen in 2000 but also died in 2003.

(13) I am deeply sorry for having a lengthy letter, but I hope you would understand me
for taking this once in a lifetime opportunity to explain my situation and so be able to find an answer
from your reputable office regarding the constitutionality of my birth right to be a US national, if not a
US citizen.

I appreciate your time and attention spent on my very important and personal letter,
and I hope and pray that you may end my suffering and anguish resulted from the ambiguity
of my identity, by providing me what I have been proudly wanting and wishing for, my United
States Nationality, if not a US citizen.

Sincerely yours,

Ernie D. Adamos, Jr.

# Oath of Allegiance

"I, **Ernesto Dominguez Adamos, Jr.**, hereby declare, on oath, that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, of whom or which I have heretofore been a subject or citizen; that I will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I will bear arms on behalf of the United States when required by the law; that I will perform noncombatant service in the armed forces of the United States when required by the law; that I will perform work of national importance under civilian direction when required by the law; and that I take this obligation freely without any mental reservation or purpose of evasion; so help me God."

_____

*Ernesto D. Adamos, Jr.*

In Witness Whereof, I have hereunto affixed my signature this _____ day of _____, 2007, County of _____, State of California.

_____
Notary Public

S. KAASA
Commission # 1631814
Notary Public - California
San Mateo County
Comm. Expires Dec 20, 2007

*Copy*



United States
# Office of
# Personnel Management

Retirement Operations Center
PO Box 45
Boyers, Pennsylvania 16017

Ernesto D.Adamos, Jr.
4320 Monterey Rd. #32
San Jose, CA 95111

April 27, 2004
CSF 1848366

Dear Mr. Adamos:

Enclosed is the information on your late father's federal service.

Our records confirm that Ernesto Adamos performed over 40 years 7 months service for the U.S.
Government in the Philippines and received an annuity from the Civil Service Retirement
System from December 1981 until his death in 1989.

You may wish to obtain further verification from his Official Personnel Folder, which is stored at
an archive facility at the National Personnel Records Center (NPRC, Civilian Personnel Records,
111 Winnebago Street, St. Louis, MO 63118-4199.

If we can be of further assistance, please let us know.

Sincerely,

Lacy Houston
Legal Administrative Assistant
Correspondence

DEPARTMENT OF THE NAVY
U. S. NAVAL SUPPLY DEPOT
BOX 33, FLEET POST OFFICE
SAN FRANCISCO, 96651

OO:DWK:rua
12830

18 DEC 1981

Mr. Ernesto ADAMOS
9 Canda Street
Olongapo City, Philippines

Dear Mr. Adamos:

On the occasion of your retirement on 18 December 1981, following more than
forty years and five months of civilian service with the Government of the
United States, I would like to take this opportunity to acknowledge your
accomplishments.

You have held various positions during your tenure of employment, the latest
of which was that of a Supply Technician, PG-11. In each position, you
demonstrated your value to the U. S. Naval Supply Depot by your steadfast
and capable performance.

It is worthy to note that during your employment, you received a Letter of
Commendation from the Commanding Officer, U. S. Naval Supply Depot, Subic
Bay in connection with the Philippine Republic Presidential Unit Citation
awarded by the President of the Philippines to your activity. In addition,
you received two Letters of Commendation in connection with the Meritorious
Unit Commendations awarded by the Secretary of the Navy to your activity,
four Letters of Appreciation for jobs well-done, 10, 15, 20, 25 and
30-Year Length of Service Awards and a 1,000 Hours or More Accumulated Sick
Leave Award. All of these tributes attest to your conscientious attitude
toward your responsibilities. The wholehearted cooperation which you have
demonstrated over the years can well serve as an example for others to
follow.

On behalf of the United States Navy, I wish to express my sincere apprecia-
tion for your long and loyal service. I wish you many years of happiness
in your well-earned retirement.

Sincerely yours,

D. W. McKINNON, JR.
Captain, SC, U. N. Navy
Commanding Officer

MODELO MUNICIPAL NUM. 97— (Revisado, 1939)

# MARRIAGE CONTRACT
CONTRATO MATRIMONIAL

**City or Municipality of** Olongapo   **Province of** Zambales
Ciudad o Municipio de                   Provincia de

| | HUSBAND / Esposo | WIFE / Esposa |
|---|---|---|
| Contracting parties / Partes contrayentes | Ernesto Reyes Adamos | Severina Reyes Dominguez |
| (a) Age / Edad | 21 years old | 18 years old |
| (b) Nationality / Nacionalidad | Filipino | Filipino |
| (c) Residence / Residencia | Olongapo, Zambales | Olongapo, Zambales |
| Single, widowed or divorced | Single | Single |
| Father / Padre | | |
| Nationality / Nacionalidad | Filipino | Filipino |
| Mother / Madre | Veronica De los Reyes | Casimera delos Reyes |
| Nationality / Nacionalidad | Filipina | Filipina |
| Witnesses / Testigos | Fabian Soriano | Felipa Marcos |
| Residence / Residencia | Olongapo, Zambales | Olongapo, Zambales |
| Person who gave consent / Persona que dió el consentimiento | | |
| (a) Residence / Residencia | | |
| (b) Relation to minor / Relación con el menor | | |
| Place of marriage / Lugar en casamiento { Office of the—Oficina del / House of—Casa de / Barrio of—Barrio de / Church of—Iglesia de } | Philippine Independent Church, Olongapo | |
| Date of Marriage / Fecha de casamiento | May 15, 1941 | |
| Marriage solemnized by / Matrimonio solemnizado por | Rev. Gregorio A. Palma | |
| (a) Title / Titulo | Priest | (b) Address / Direccion   Olongapo, ... |

Ernesto Reyes Adamos y Severina Reyes ...

... and in the presence of the ....
solemn ... of the above named two witnesses, both of age, take each other as man and wife.

And I, Gregorio A. Palma, Priest

CERTIFY: That on the date and at the place above written, the aforesaid Ernesto Reyes ...
and Severina Reyes Dominguez were with their mutual consent lawfully join ...

in matrimony by me in the presence of the above-named witnesses, both of age; and I further ...

Marriage License No. 545725   issued at Olongapo, Zbs.   on May 15 ...

in favor of said parties, was exhibited to me (or no marriage license was exhibited to me, this marriage ...
are exceptional character, performed under section ... Chapter II, of Act 3613); and that consent to ...
marriage was duly given by law, by the person or persons above mentioned.

IN WITNESS WHEREOF, we sign (or mark with our fingerprint) this certificate in triplicate, this 15
day of a May, 1941.

Ernesto Reyes Adamos                           Severina Reyes Dominguez
ERNESTO REYES ADAMOS                           SEVERINA REYES DOMINGUEZ
(Signature of male contracting party—Firma del contrayente)   (Signature of female contracting party—Firma de la contrayente)

REV. GREGORIO A. PALMA
(Signature of person solemnizing marriage—Firma de la persona que solemnizo el matrimonio)
Priest
(Title—Titulo)

Witnesses:
Testigos:

The Secretary of State of the United States of America
hereby requests all whom it may concern to permit the citizen/national
of the United States named herein to pass without delay or hindrance
and in case of need to give all lawful aid and protection.

Le Secrétaire d'Etat des Etats-Unis d'Amérique
prie par les présentes toutes autorités compétentes de laisser passer le citoyen
ressortissant des Etats-Unis titulaire du présent passeport, sans délai ni
difficulté et, en cas de besoin, de lui accorder toute aide et protection légitimes.

El Secretario de Estado de los Estados Unidos de América por el presente solicita a las
autoridades competentes permitir el paso del ciudadano o nacional de los Estados Unidos
aquí nombrado, sin demora ni dificultades, y en caso de necesidad, prestarle toda la
ayuda y protección lícitas.

SIGNATURE OF BEARER/SIGNATURE DU TITULAIRE/FIRMA DEL TITULAR

NOT VALID UNTIL SIGNED

PASSPORT
PASSEPORT
PASAPORTE

UNITED STATES OF AMERICA

Type / Type / Tipo     Code / Code / Código     Passport No. / No. du Passeport / No. de Pasaporte
P          USA          203949757

Surname / Nom / Apellidos
ADAMOS

Given names / Prénoms / Nombres
SEVERINA DOMINGUEZ

Nationality / Nationalité / Nacionalidad
UNITED STATES OF AMERICA

Date of birth / Date de naissance / Fecha de nacimiento
26 Oct 1922

Sex / Sexe / Sexo     Place of birth / Lieu de naissance / Lugar de nacimiento
F          PHILIPPINES

Date of issue / Date de délivrance / Fecha de expedición
13 Nov 2000

Authority / Autorité / Autoridad
National
Passport Center

Date of expiration / Date d'expiration / Fecha de caducidad
12 Nov 2010

Amendments / Modifications / Enmiendas
See Page 24

P<USAADAMOS<<SEVERINA<DOMINGUEZ<<<<<<<<<<<
2039497572USA2210252F1011120<<<<<<<<<<<<202



## POLICE FORCE GROUP PHOTO



# ⚡ CALIFORNIA ⚡

DRIVER LICENSE

A5183

CLASS: C



ERNESTO DOMINGUEZ ADAMUS, Jr
4320 MONTEREY RD APT 32
SAN JOSE CA 95111

SEX:M    HAIR:BLK    EYES:BRN
HT:5-05    WT:146

08/12/2003 $16 30 FD/08

REPUBLIKA NG PILIPINAS
*REPUBLIC OF THE PHILIPPINES*
*Department of Foreign Affairs*
Kagawaran ng Ugnayang Panlabas

Ang Pamahalaan ng Republika ng Pilipinas ay humihiling sa lahat ng kinauukulan na pahintulutan ang naghahawak nito, isang mamamayan ng Pilipinas, na ang lagda ay makikita sa ibaba, na makaraan nang malaya at walang sagabal, at kung kailangan ay pag-ukulan siya ng lahat ng tulong at proteksiyon ayon sa batas.

*The Government of the Republic of the Philippines requests all concerned to permit the bearer, a citizen of the Philippines, whose signature appears below, to pass safely and freely, and in case of need to give him/her all lawful aid and protection.*

Lagda ng pinagkalooban/Bearer's signature

REPUBLIKA NG PILIPINAS/REPUBLIC OF THE PHILIPPINES
*Uri/Type  Kodigo ng bansa/Country code  Pasaporte Blg./Passport number*

PHL        LL1165480

PASAPORTE/
PASSPORT

Apelyido/Surname
**ADAMS**

Pangalan/Given name
**ERNESTO JR.**

Pangalang apelyido/Middle name
**DOMINGUEZ**

Nasyonalidad/Nationality
**FILIPINO**

Petsa ng kapanganakan/Date of birth
**28 NOV 1945**

Lugar ng kapanganakan/Place of birth
**BACOOR, CAVITE**

Petsa ng pagkakaloob/Date of issue
**09 JUL 2003**

Naglilagdang awtoridad/Issuing authority
**PHILIPPINES**

(FORMERLY ST. JOSEPH'S SCHOOL)
2200 Olongapo City, PHILIPPINES

*THIS IS A TRUE COPY SUBMIT WHERE*
*T _____ PURSUANT THE*
*M.S _____ RESOURCES*
*OF OLONGAPO.*

**CERTIFICATION**

To Whom It May Concern:

This is to certify that **ERNESTO D. ADAMOS** had been a student of this institution, **ST. JOSEPH'S SCHOOL** now **ST. JOSEPH COLLEGE-OLONGAPO, INC.** He finished his Elementary on _____ and Secondary Course on **March 1963** under **Special** *Order (A) No. 9-0328 s. 1963*

Issued this **25th day of January, 2007** upon request of the above-named, for whatever legal purpose it may best serve.

ENCARNACION A. RIMON
**Principal**

ELEMENTARY DEPARTMENT       HIGH SCHOOL DEPARTMENT       VOC-TEC/COLLEGE DEPT.       ACCOUNTING DEPARTMENT
(047) 223-5368                    (047) 223-5486               (047) 224-9413           TEL. (047) 222-3390
                                                                                          FAX (047) 223-4719



REPUBLIC OF THE PHILIPPINES

DEPARTMENT OF EDUCATION

BUREAU OF PRIVATE SCHOOLS

**St. Joseph's School**

OLONGAPO     ZAMBALES

This is to certify that **Ernesto Adamos**

has satisfactorily completed the Primary Course as approved by the Director of Private Schools.

Dated at Olongapo, Zambales, this 21st day of March, 1956

PRINCIPAL

DIRECTOR



REPUBLIC OF THE PHILIPPINES     DEPARTMENT OF EDUCATION     BUREAU OF PRIVATE SCHOOLS

St. Joseph's School
OLONGAPO          ZAMBALES

This certifies that ........ Ernesto Adamos Jr. .............. has
satisfactorily completed the Elementary Curriculum as prescribed
by the Secretary of Education for the Elementary Schools, and is there-
fore entitled this

CERTIFICATE

Given at Olongapo, Zambal s this 19th day of .......March ........ 1959

................................................
PRINCIPAL

................................................
DIRECTOR

# THE OLONGAPO STORY

### July 28, 1953 - Bamboo Breeze - Vol.6, No.3

Present day Olongapo sprawls across a vast area of uneven low lands, hemmed in by deep, menacing jungles and tall Zambales mountains which form a green contrasting background for the town's gray, dusty streets and low, squat buildings.

Viewed from its northern hillsides, Olongapo presents a lazy panorama of a typical Philippine town: its sturdy wooden houses grouped together in blocks; its main road stretched out like a ribbon across the town; sluggish rivers that divide the area in barrio districts; and its famous bay that breaks the circle of mountains seeking to embrace the whole town completely—all these give Olongapo an impression of contented conventionality.

Olongapo however is not a conventional community nor a typical town. Politically speaking, it is not even a town. For while a regular town or municipality would elects its own officers to administer its laws and ordinances, in Olongapo there is a Town Council, composed of Olongapo residents, some elected and some appointed to the Council, headed by a Reservation Officer who is appointed by the Commanding Officer of the U.S. Naval Station. The Reservation Officers acts as the town mayor and represents the U. S. Naval Station in Olongapo.

### Community of Contrasts

Olongapo is a community of contrasts. Behind the thin veneer of pseudo-cosmopolitan and Navy influences, its core remains predominantly provincial. Along its main highways new commercial establishment—strategically deployed to take in as much trade as possible—stand side by side with residential houses which seem to ignore all the business and the town's traffic. In spite of the thriving bars and nightclubs, Olongapo remains, relatively, a quiet town. And while its citizens could be blase about the capers of the American sailor at the local night spots, his presence at a private party in a Filipino home is, surprisingly, a thing of constant wonder and a topic of conversation among the other guests.

The Reservation is perhaps the most unique community in the country. It is the only place where the American and Philippine flags are flown in front of public buildings; it is the only place where a driver needs two—in some cases, three—driver's licenses.

Like most Philippine towns, Olongapo has its share of legends and folk tales. The stories of how Olongapo got its name range from the grisly bizarre to the downright hilarious. Three versions have persistently turned up whenever the subject is discussed. The first relates the story of the old man's head.

### Old Man's Head

There lived in these parts, a long, long time ago, as the story goes, an old rich man, Olongapo was then a vast rice field and this old man owned every square inch of the land. Gentle and generous as he was, this old man was respected and loved by all. One day, the people noticed that the old man was missing. This was strange since it was his custom to be up and around, especially during harvest season. After missing him for three days, the people really became apprehensive and the fate of the old man became the talk of the town. His disappearance remained unexplained, but still a greater mystery was the appearance of the old man's body was never

recovered and from then on, the residents of the village referred to the place as Olongapo--"Ulo ng Apo," which means "old man's head" in Tagalog.

Another version relates that Olongapo is really the Spanish corrupt pronunciation of another Tagalog phrase: "Hulo na apo." It seemed that a Spanish officer asked a native for the name of the place. The fellow, misunderstanding the Spaniard, replied: "Hulo, na Apo," which meant, "There is nothing beyond, sir, "referring to the fact that Olongapo was the 1st place there is at this point of the province.

Still other people believe that Olongapo means "Hulo ng Apo"--the Chief's Home. They contend that in ancient times Olongapo was the home of a powerful tribal chieftain. Whichever is the real legend is a matter of conjecture. The fact stands that Olongapo had always been a maritime town.

Before Olongapo became involved in its present naval activities, it was just a little village with no more than a few hundred inhabitants who contendedly engaged in their small fishing and farming industries. The hardy residents were mainly simple folks unconcerned with what happened beyond their community. Because Olongapo was almost completely isolated from the rest of the province by the Zambales mountains, the place remained insignificant and unknown. Olongapo had not sort of major industry to speak of; no roads to connect it with the other towns-- the only way to reach it was by boats; it was just like so many inaccessible barrios of the time.

## Spanish Arsenal

In 1868 however Olongapo was awakened from its lethargy. The Spanish government decided to establish a navy yard and because of its fine natural harbor and water depths, Olongapo became an ideal site. Within ten years, the Spaniards had erected walls and markers to fence off the arsenal--as they called the base then--from the civilian community. The Spanish Navy Yard occupied the entire area east of the Spanish Gate. Employing Filipino labor, they dredged the area and filled in low spots. They had shops and buildings erected. The Spanish government spent almost three decades developing the Naval Station. In 1898, when the construction of the Spanish Administration Building was hardly completed, a detachment of Admiral Dewey's fleet bombarded the Navy Yard. Eventually, after the surrender, Spain relinquished all her rights in the Philippines to the United States. This marked the end of more than three hundred years of Castilian rule over the islands.

Realizing the tremendous importance of Olongapo as a naval facility, the U. S. Navy decided to keep the base in functioning order. So the President of the United States, then Theodore Roosevelt, on 9 November 1901 by executive order, reserved the waters of Subic and some of the adjacent lands for naval purposes.

## Naval Station Expanded

The Naval Station was widened and with the establishment of the American rule in the Philippines, American defenses in the islands were facilities left by the Spanish Navy were taken over by the United States. (Some buildings erected by the Spaniards are still in use at present. Shop 31 is built on the skeleton of the Spanish Administration Building which suffered heavy damage under enemy fire during the Japanese invasion and the Philippine liberation.)

Olongapo grew in direct proportion to the growth of the Naval Station. More people came to

live in Olongapo since the Navy offered employment. To most Filipinos during that time, it was a welcome change. The promise of a different kind of experience as shop workers and office help induced many young men to leave their farms and fishing boats to work in the Navy Yard. Others finding the lure of the sea irresistible joined the U. S. Navy and really saw the world.

About the year 1908, the Station Intelligence Officer, a member of the U. S. Marine Corps, was charged with the responsibility of the administrative control of Olongapo. He was in this capacity acting as mayor, judge, and police officer! To defray the costs of running his municipal government, and to pay salaries of the civilian clerks who worked under him, he initiated a charge, ten centavos, for the identification card which residents of Olongapo were required to have. With the growth of Olongapo, the naval authorities established a well planned town site which provided for all the attendant conveniences of a modern town; paved streets, sidewalks, concrete gutters, fire department, schools, hospitals and other municipal projects.

### Charge Identification Cards

Identification cards were subsequently increased to meet municipal expenses. Besides that, every able bodied male citizen who was granted a land occupancy permit was required to donate four days free labor to Olongapo or to pay a "waiver fee" in the amount of 3.20 pesos which was later increased to four pesos. ( This donation of free labor was established during the Spanish regime when the government exacted some amount of work from all the residents in a community to maintain its construction projects.)

In 1925, the provincial government constructed a hard-surface road cutting across the mountains that surrounds Olongapo and for the first time motor travel between Olongapo and the rest of the province was possible. The highway was named Manila Avenue because it was the road to the capital city. Soon Olongapo became a business center. Since new employment vacancies were opened to Filipinos at the Navy Yard,  the influx of people in Olongapo was greater than ever. Business establishments sprang up to meet the demands of the population--meet significant of which were the establishment of hotels, bars and night clubs, which in the Philippines could be found only in cities.

Before the outbreak of World War II, Olongapo had a total population of 5,000. (Olongapo today numbers 25,000 inhabitants.) A great majority of the male inhabitants were employed in the U.S. Navy. The old Olongapo town has a compact, clean and cheerful place. The people were comparatively prosperous and considered living in Olongapo a great advantage and an honor as well. And no wonder! For Olongapo enjoyed all the comforts of a modern community: fire protection system; electric plant and drainage system,; Its civic improvements included a spacious market, public elementary and high schools and a hospital, adequate enough to serve the needs of the town.

No domestic animals roamed the streets of Olongapo before the war. All families who wanted to raise pigs were required to bring them to Wawa--the place by the foot of Kalaklan Bridge-- where the town maintained a sort of pig farm. All dogs in Olongapo wore muzzles then; all carabaos were confined in the farm districts of Bajac-bajac and Tapinac. The Marines detailed as police officers and sanitary inspectors used to go around early in the morning, knocking at people's doors to remind them that their house surroundings should be cleaned.

When the fleet was in, there was usually a curfew hour for Olongapo women and by six  o'clock in the evening, no decent, self-respecting girl dared to venture out in the streets.

Garcia, Assistant Reservation Officer and Mr. Segundo Domingo, Administrative Assistant.

Pleasant-faced and hard-working ENS Garcia is considered to be one of the best things that has happened to bolster the Philippine American friendship. The fact alone that ENS Garcia can pronounce the Filipino names with proper accent have done a great deal to promote Navy and civilian cordial relations.

Mr. Segundo Domingo  is an Olongapo old-timer who started out as an ordinary clerk in the Reservation Office in 1928.  Mr. Domingo has held a various succession jobs until he became Administrative Assistant.

The residents of Olongapo are today, more than ever, conscious of their civic duties.  Public works employees devote part of their time to the Reservation.  Together with some American civilians, like Mr. George Fedor, and the SeaBees, they are going out of their way in constructing schoolhouses, filling in low areas and widening streets, without any compensation what so ever except perhaps the satisfaction  of doing something to make Olongapo a better place to live.

Olongapo today stands as a symbol of Philippine-American harmony--a picture of democracy in action.  In transplanting a piece of the American mainland at the Naval Station here, the U.S. Navy has not found an entirely alien land--the typography might be different, the temperature might be a bit higher, but the Americans here have also found a friendly people, people who like them, believe in the rights of the common man.  There in lies their common bond and that is the story of Olongapo.  It is not only the Reservation's story, but the story of the Navy's success in diplomatic and human relations as well.

**AN ACT TO PROVIDE FOR THE COMPLETE INDEPENDENCE OF THE PHILIPPINE ISLANDS, TO PROVIDE FOR THE ADOPTION OF A CONSTITUTION AND A FORM OF GOVERNMENT FOR THE PHILIPPINE ISLANDS, AND FOR OTHER PURPOSES.**

### Convention to Frame Constitution for Philippine Islands

Section 1. The Philippine Legislature is hereby authorized to provide for the election of delegates to a constitutional convention, which shall meet in the hall of the House of Representatives in the capital of the Philippine Islands, at such time as the Philippine Legislature may fix, but not later than October 1, 1934, to formulate and draft a constitution for the government of the Commonwealth of the Philippine Islands, subject to the conditions and qualifications prescribed in this Act, which shall exercise jurisdiction over all the territory ceded to the United States by the treaty of peace concluded between the United States and Spain on the 10th day of December, 1898, the boundaries of which are set forth in Article III of said treaty, together with those islands embraced in the treaty between Spain and the United States concluded at Washington on the 7th day of November, 1900. The Philippine Legislature shall provide for the necessary expenses of such convention.

### Character of Constitutions — Mandatory Provisions

Sec. 2. (a) The constitution formulated and drafted shall be republican in form, shall contain a bill of rights, and shall, either as a part thereof or in an ordinance appended thereto, contain provisions to the effect that, pending the final and complete withdrawal of the sovereignty of the United States over the Philippine Islands —

(1) All citizens of the Philippine Islands shall owe allegiance to the United States.chan robles virtual law library

(2) Every officer of the government of the Commonwealth of the Philippine Islands shall, before entering upon the discharge of his duties, take and subscribes an oath of office, declaring, among other things, that he recognizes and accepts the supreme authority of and will maintain true faith and allegiance to the United States.

(3) Absolute toleration of religious sentiment shall be secured and no inhabitant or religious organization shall be molested in person or property on account of religious belief or mode of worship.

(4) Property owned by the United States, cemeteries, churches, and parsonages or convents appurtenant thereto, and all lands, buildings, and improvements used exclusively for religious, charitable, or educational purposes shall be exempt from taxation.chan robles virtual law library

(5) Trade relations between the Philippine Islands and the United States shall be upon the basis prescribed in section 6.

(6) The public debt of the Philippine Islands and its subordinate branches shall not exceed limits now or hereafter fixed by the Congress of the United States; and no loans shall be contracted in foreign countries without the approval of the President of the United States.

(7) The debts, liabilities, and obligations of the present Philippine Government, its provinces, municipalities, and instrumentalities, valid and subsisting at the time of the adoption of the constitution, shall be assumed and paid by the new government.

(8) Provision shall be made for the establishment and maintenance of an adequate system of public schools, primarily conducted in the English language.chan robles virtual law library

(9) Acts affecting currency, coinage, imports, exports, and immigration shall not become law until approved by the President of the United States.

(10) Foreign affairs shall be under the direct supervision and control of the United States.

(11) All acts passed by the Legislature of the Commonwealth of the Philippine Islands shall be reported to the Congress of the United States.

(12) The Philippine Islands recognizes the right of the United States to expropriate property for public uses, to maintain military and other reservations and armed forces in the Philippines, and, upon order of the President, to call into the service of such armed forces all military forces organized by the Philippine Government.

(13) The decisions of the courts of the Commonwealth of the Philippine Islands shall be subject to review by the Supreme Court of the United States as provided in paragraph 6 of section 7. chan robles virtual law library

(14) The United States may, by Presidential proclamation, exercise the right to intervene for the preservation of the government of the Commonwealth of the Philippine Islands and for the maintenance of the government as provided in the constitution thereof, and for the protection of life, property, and individual liberty and for the discharge of government obligations under and in accordance with the provisions of the constitution.

(15) The authority of the United States High Commissioner to the government of the Commonwealth of the Philippine Islands, as provided in this Act, shall be recognized.chan robles virtual law library

(16) Citizens and corporations of the United States shall enjoy in the Commonwealth of the Philippine Islands all the civil rights of the citizens and corporations, respectively, thereof.

(b) The constitution shall also contain the following provisions, effective as of the date of the proclamation of the President recognizing the independence of the Philippine Islands, as hereinafter provided:

(1) That the property rights of the United States and the Philippine Islands shall be promptly adjusted and settled, and that all existing property rights of citizens or corporations of the United States shall be acknowledged, respected, and safeguarded to the same extent as property rights of citizens of the Philippine Islands.

(2) That the officials elected and serving under the constitution adopted

pursuant to the provisions of this Act shall be constitutional officers of the free and independent Government of the Philippine Islands and qualified to function in all respects as if elected directly under such government, and shall serve their full terms of office as prescribed in the constitution.

(3) That the debts and liabilities of the Philippine Islands, its provinces, cities, municipalities, and instrumentalities, which shall be valid and subsisting at the time of the final and complete withdrawal of the sovereignty of the United States, shall be assumed by the free and independent Government of the Philippine Islands; and that where bonds have been issued under authority of an Act of Congress of the United States by the Philippine Islands, or any province, city, or municipality therein, the Philippine Government will make adequate provision for the necessary funds for the payment of interest and principal, and such obligations shall be a first lien on the taxes collected in the Philippine Islands.

(4) That the Government of the Philippine Islands, on becoming independent of the United States, will assume all continuing obligations assumed by the United States under the treaty of peace with Spain ceding said Philippine Islands to the United States. chan robles virtual law library

(5) That by way of further assurance the Government of the Philippine Islands will embody the foregoing provisions [except paragraph (2)] in a treaty with the United States.

### Submission of Constitution to the President of the United States

Sec. 3. Upon the drafting and approval of the constitution by the constitutional convention in the Philippine Islands, the constitution shall be submitted within two years after the enactment of this Act to the President of the United States, who shall determine whether or not it conforms with the provisions of this Act. If the President finds that the proposed constitution conforms substantially with the provisions of this Act he shall so certify to the Governor-General of the Philippine Islands, who shall so advise the constitutional convention. If the President finds that the constitution does not conform with the provisions of this Act he shall so advise the Governor-General of the Philippine Islands, stating wherein in his judgment the constitution does not so conform and submitting provisions which will in his judgment make the constitution so conform. The Governor-General shall in turn submit such message to the constitutional convention for further action by them pursuant to the same procedure hereinbefore defined, until the President and the constitutional convention are in agreement. chan robles virtual law library

### Submission of Constitution to Filipino People

Sec. 4. After the President of the United States has certified that the constitution conforms with the provisions of this Act, it shall be submitted to the people of the Philippine Islands for their ratification or rejection at an election to be held within four months after the date of such certification, on a date to be fixed by the Philippine Legislature, at which election the qualified voters of the Philippine Islands shall have an opportunity to vote directly for or against the proposed constitution and ordinances appended thereto. Such election shall be held in such manner as may be prescribed by the Philippine Legislature, to which the return of the election shall be made. The

Philippine Legislature shall by law provide for the canvassing of the return and shall certify the result to the Governor-General of the Philippine Islands, together with a statement of the votes cast, and a copy of said constitution and ordinances. If a majority of the votes cast shall be for the constitution, such vote shall be deemed an expression of the will of the people of the Philippine Islands in favor of Philippine independence, and the Governor-General shall, within thirty days after receipt of the certification from the Philippine Legislature, issue a proclamation for the election of officers of the government of the Commonwealth of the Philippine Islands provided for in the constitution. The election shall take place not earlier than three months nor later than six months after the proclamation by the Governor-General ordering such election. When the election of the officers provided for under the constitution has been held and the results determined, the Governor-General of the Philippine Islands shall certify the results of the election to the President of the United States, who shall thereupon issue a proclamation announcing the results of the election, and upon the issuance of such proclamation by the President the existing Philippine Government shall terminate and the new government shall enter upon its rights, privileges, powers, and duties, as provided under the constitution. The present Government of the Philippine Islands shall provide for the orderly transfer of the functions of government.

If a majority of the votes cast are against the constitution, the existing Government of the Philippine Islands shall continue without regard to the provisions of this Act.chan robles virtual law library

### Transfer of Property and Rights to Philippine Commonwealth

Sec. 5. All the property and rights which may have been acquired in the Philippine Islands by the United States under the treaties mentioned in the first section of this Act, except such land or other property as has heretofore been designated by the President of the United States for and other reservations of the Government of the United States, and except such land or other property or rights or interests therein as may have been sold or otherwise disposed of in accordance with law, are hereby granted to the government of the Commonwealth of the Philippine Islands when constituted.

### Relations with the United States Pending Complete Independence

Sec. 6. After the date of the inauguration of the government of the Commonwealth of the Philippine Islands trade relations between the United States and the Philippine Islands shall be as now provided by law, subject to the following exceptions:chan robles virtual law library

(a) There shall be levied, collected, and paid on all refined sugars in excess of fifty thousand long tons, and on unrefined sugars in excess of eight hundred thousand long tons, coming into the United States from the Philippine Islands in any calendar year, the same rates of duty which are required by the laws of the United States to be levied, collected, and paid upon like articles imported from foreign countries.

(b) There shall be levied, collected, and paid on all coconut oil coming into the United States from the Philippine Islands in any calendar year in excess of two hundred thousand long tons, the same rates of duty which are required by the

laws of the United States to be levied, collected, and paid upon like articles imported from foreign countries.

(c) There shall be levied, collected, and paid on all yarn, twine, cord, cordage, rope and cable, tarred or untarred, wholly or in chief value of Manila (abaca) or other hard fibers, coming into the United States from the Philippine Islands in any calendar year in excess of a collective total of three million pounds of all such articles hereinbefore enumerated, the same rates of duty which are required by the laws of the United States to be levied, collected, and paid upon like articles imported from foreign countries.chan robles virtual law library

(d) In the event that in any year the limit in the case of any article which may be exported to the United States free of duty shall be reached by the Philippine Islands, the amount or quantity of such articles produced or manufactured in the Philippine Islands thereafter that may be so exported to the United States free of duty shall be allocated, under export permits issued by the government of the Commonwealth of the Philippine Islands, to the producers or manufacturers of such articles proportionately on the basis of their exportation to the United States in the preceding year; except that in the case of unrefined sugar the amount thereof to be exported annually to the United States free of duty shall be allocated to the sugar-producing mills of the Islands proportionately on the basis of their average annual production for the calendar years 1931, 1932, and 1933, and the amount of sugar from each mill which may be so exported shall be allocated in each year between the mill and the planters on the basis of the proportion of sugar to which the mill and the planters are respectively entitled. The Government of the Philippine Islands is authorized to adopt the necessary laws and regulations for putting into effect the allocation hereinbefore provided.chan robles virtual law library

(e) The government of the Commonwealth of the Philippine Islands shall impose and collect an export tax on all articles that may be exported to the United States from the articles that may be exported to the United States from the Philippine Islands free of duty under the provisions of existing law as modified by the foregoing provisions of this section including the articles enumerated in subdivisions (a), (b) and (c), within the limitations therein specified, as follows:

(1) During the sixth year after the inauguration of the new government the export tax shall be 5 per centum of the rates of duty which are required by the laws of the United States to be levied, collected, and paid on like articles imported from foreign countries;

(2) During the seventh year after the inauguration of the new government the export tax shall be 10 per centum of the rates of duty which are required by the laws of the United States to be levied, collected, and paid on like articles imported from foreign countries;

(3) During the eighth year after the inauguration of the new government the export tax shall be 15 per centum of the rates of duty which are required by the laws of the United States to be levied, collected, and paid on like articles imported from foreign countries;

(4) During the ninth year after the inauguration of the new government the export tax shall be 20 per centum of the rates of duty

which are required by the laws of the United States to be levied, collected, and paid on like articles imported from foreign countries;

(5) After the expiration of the ninth year of the inauguration of the new government the export tax shall be 25 per centum of the rates of duty which are required by the laws of the United States to be levied collected and paid on like articles imported from foreign countries.

The government of the Commonwealth of the Philippine Islands shall place all funds received in such export taxes in a sinking fund, and such funds shall, in addition to other moneys available for the purpose, be applied solely to the payment of the principal interest on the bonded indebtedness of the Philippine Islands, provinces, municipalities, and instrumentalities until such indebtedness has been fully discharged.

When used in this section in a geographical sense, the term "United States" includes all Territories and possessions of the United States, except the Philippine Islands, the Virgin Islands, American Samoa, and the island of Guam.

Sec. 7. Until the final and complete withdrawal of American sovereignty over the Philippine Islands—

(1) Every duly adopted amendment to the constitution of the government of the Commonwealth of the Philippine Islands shall be submitted to the President of the United States for approval. If the President approves the amendment or if the President fails to disapprove such amendment within six months from the time of its submission, the amendment shall take effect as a part of such constitution.

(2) The President of the United States shall have authority to suspend the taking effect of or the operation of any law, contract, or executive order of the government of the Commonwealth of the Philippine Islands, which in his judgment will result in a failure of the government of the Commonwealth of the Philippine Islands to fulfill its contracts, or to meet its bonded indebtedness and interest thereon or to provide for its sinking funds, or which seems likely to impair the reserves for the protection of the currency of the Philippine Islands, or which in his judgment will violate international obligations of the United States.

(3) The Chief Executive of the Commonwealth of the Philippine Islands shall make an annual report to the President and Congress of the United States of the proceedings and operations of the government of the Commonwealth of the Philippine Islands and shall make such other reports as the President or Congress may request.chan robles virtual law library

(4) The President shall appoint, by and with the advice and consent of the Senate, a United States High Commissioner to the government of the Commonwealth of the Philippine Islands who shall hold office at the pleasure of the President and until his successor is appointed and qualified. He shall be known as the United States High Commissioner to the Philippine Islands. He shall be the representative of the President of the United States in the Philippine Islands and shall be recognized as such by the government of the Commonwealth of the Philippine Islands, by the commanding officers of the military forces of the United States, and by all civil officials of the United States in the Philippine Islands. He shall have access to all records of the government or any subdivision thereof, and shall be furnished by the Chief Executive of the Commonwealth of the Philippine Islands with such information as he shall request.

If the government of the Commonwealth of the Philippine Islands fails to pay any of its bonded or other indebtedness or the interest thereon when due or to fulfill any of its contracts, the United States High Commissioner shall immediately report the facts to the President, who may thereupon direct the High Commissioner to take over the customs offices and administration of the same, administer the same, and apply such part of the revenue received therefrom as may be necessary for the payment of such overdue indebtedness or for the fulfillment of such contracts. The United States High Commissioner shall annually, and at such other times as the President may require, render an official report to the President and Congress of the United States. He shall perform such additional duties and functions as may be delegated to him from time to time by the President under the provisions of this Act.

The United States High Commissioner shall receive the same compensation as is now received by the Governor-General of the Philippine Islands, and shall have such staff and assistants as the President may deem advisable and as may be appropriated for by Congress, including a financial expert, who shall receive for submission to the High Commissioner a duplicate copy of the reports to the insular auditor. Appeals from decisions of the insular auditor may be taken to the President of the United States. The salaries and expenses of the High Commissioner and his staff and assistants shall be paid by the United States.

The first United States High Commissioner appointed under this Act shall take office upon the inauguration of the new government of the Commonwealth of the Philippine Islands.

(5) The government of the Commonwealth of the Philippine Islands shall provide for the selection of a Resident Commissioner to the United States, and shall fix his term of office. He shall be the representative of the government of the Commonwealth of the Philippine Islands and shall be entitled to official recognition as such by all departments upon presentation to the President of credentials signed by the Chief Executive of said government. He shall have a seat in the House of Representatives of the United States, with the right of debate, but without the right of voting. His salary and expenses shall be fixed and paid by the Government of the Philippine Islands. Until a Resident Commissioner is selected and qualified under this section, existing law governing the appointment of Resident Commissioners from the Philippine Islands shall continue in effect.chan robles virtual law library

(6) Review by the Supreme Court of the United States of cases from the Philippine Islands shall be as now provided by law; and such review shall also extend to all cases involving the constitution of the Commonwealth of the Philippine Islands.

Sec. 8. (a) Effective upon the acceptance of this Act by concurrent resolution of the Philippine Legislature or by a convention called for that purpose, as provided in section 17:chan robles virtual law library

(1) For the purposes of the Immigration Act of 1917, the Immigration Act of 1924 [except section 13 (c)], this section, and all other laws of the United States relating to the immigration, exclusion, or expulsion of aliens, citizens of the Philippine Islands who are not citizens of the United States shall be considered as if they were aliens. For such purposes the Philippine Islands shall be considered as a separate country and shall have for each fiscal year a quota of fifty. This paragraph shall not apply to a person coming or seeking to come to the Territory of Hawaii who does not apply for and secure an

immigration or passport visa, but such immigration shall be determined by the Department of the Interior on the basis of the needs of industries in the Territory of Hawaii.

(2) Citizens of the Philippine Islands who are not citizens of the United States shall not be admitted to the continental United States from the Territory of Hawaii (whether entering such territory before or after the effective date of this section) unless they belong to a class declared to be non-immigrants by section 3 of the Immigration Act of 1924 or to a class declared to be nonquota immigrants under the provisions of section 4 of such Act other than subdivision (c) thereof, or unless they were admitted to such territory under an immigration visa. The Secretary of Labor shall by regulations provide a method for such exclusion and for the admission of such excepted classes.

(3) Any Foreign Service officer may be assigned to duty in the Philippine Islands, under a commission as aconsular officer, for such period as may be necessary and under such regulations as the Secretary of State may prescribe, during which assignment such officer shall be considered as stationed in a foreign country; but his powers and duties shall be confined to the performance of such of the official acts and notarial and other services, which such officer might properly perform in respect to the administration of the immigration laws if assigned to a foreign country as a consular officer, as may be authorized by the Secretary of State.

(4) For the purposed of sections 18 and 20 of the Immigration Act of 1917, as amended, the Philippine Islands shall be considered a foreign country.

(b) The provisions of this section are in addition to the provisions of the immigration laws now in force, and shall be enforced as part of such laws, and all the penal or other provisions of such laws not applicable, shall apply to and be enforced in connection with the provisions of this section. An alien, although admissible under the provisions of this section, shall not be admitted to the United States if he is excluded by any provision of the immigration laws other than this section, and an alien, although admissible under the provisions of the immigration laws other than this section, shall not be admitted to the United States if he is excluded by any provision of this section.

(c) Terms defined in the Immigration Act of 1924 shall, when used in this section, have the meaning assigned to such terms in the Act. chan robles virtual law library

Sec. 9. There shall be no obligation on the part of the United States to meet the interest or principal of bonds and other obligations of the Government of the Philippine Islands or of the provincial and municipal governments thereof, hereafter issued during the continuance of United States sovereignty in the Philippine Islands: Provided, That such bonds and obligations hereafter issued shall not be exempt from taxation in the United States or by authority of the United States.

Recognition of Philippine Independence and Withdrawal of American Sovereignty

Sec. 10. (a) On the 4th, day of July immediately following the expiration of a period of ten years from the date of the inauguration of the new government under the constitution provided for in this Act the President of the United States shall by proclamation withdraw and surrender all right of possession, supervision, jurisdiction, control, or sovereignty then existing and exercised by the United States in

and over the territory and people of the Philippine Islands, including all military and other reservations of the Government of the United States in the Philippines (except such naval reservations and fueling stations as are reserved under section 5), and, on behalf of the United States, shall recognize the independence of the Philippine Islands as a separate and self-governing nation and acknowledge the authority and control over the same of the government instituted by the people thereof, under the constitution then in force.chan robles virtual law library

(b) The President of the United States is hereby authorized and empowered to enter into negotiations with the Government of the Philippine Islands, not later than two years after his proclamation recognizing the independence of the Philippine Islands, for the adjustment and settlement of all questions relating to naval reservations and fueling stations of the United States in the Philippine Islands, and pending such adjustment and settlement the matter of naval reservations and fueling stations shall remain in its present status.

## Neutralization of Philippine Islands

Sec. 11. The President is requested, at the earliest practicable date, to enter into negotiations with foreign powers with a view to the conclusion of a treaty for the perpetual neutralization of the Philippine Islands, if and when the Philippine independence shall have been achieved.

## Notification to Foreign Governments

Sec. 12. Upon the proclamation and recognition of the independence of the Philippine Islands, the President shall notify the governments with which the United States is in diplomatic correspondence thereof and invite said governments to recognize the independence of the Philippine Islands.chan robles virtual law library

## Tariff Duties After Independence

Sec. 13. After the Philippine Islands have become a free and independent nation there shall be levied, collected, and paid upon all articles coming into the United States from the Philippine Islands the rates of duty which are required to be levied, collected, and paid upon like articles imported from other foreign countries: Provided, That at least one year prior to the date fixed in this Act for the independence of the Philippine Islands, there shall be held a conference of representatives of the Government of the United States and the Government of the Commonwealth of the Philippine Islands, such representatives to be appointed by the President of the United States and the Chief Executive of the Commonwealth of the Philippine Islands, respectively, for the purpose of formulating recommendations as to future trade relations between the Government of the United States and the independent Government of the Philippine Islands, the time, place, and manner of holding such conference to be determined by the President of the United States; but nothing in this proviso shall be construed to modify or affect in any way any provision of this Act relating to the procedure leading up to Philippine independence or the date upon which the Philippine Islands shall become independent.

## Immigration After Independence

**Sec. 14.** Upon the final and complete withdrawal of American sovereignty over the Philippine Islands the immigration laws of the United States (including all the provisions thereof relating to persons ineligible to citizenship) shall apply to persons who were born in the Philippine Islands to the same extent as in the case of other **foreign countries.**chan robles virtual law library

## Certain Statutes Continued In Force

**Sec. 15.** Except as in this Act otherwise provided, the laws now or hereafter in force in the Philippine Islands shall continue in force in the Commonwealth of the Philippine Islands until altered, amended, or repealed by the Legislature of the Commonwealth of the Philippine Islands or by the Congress of the United States, and all references in such laws to the government or officials of the Philippines or Philippine Islands shall be construed, insofar as applicable, to refer to the government and corresponding officials respectively of the Commonwealth of the Philippine Islands. The government of the Commonwealth of the Philippine Islands shall be deemed successor to the present Government of the Philippine Islands and of all the rights and obligations thereof. Except as otherwise provided in this Act, all laws or parts of laws relating to the present Government of the Philippine Islands and its administration are hereby repealed as of the date of the inauguration of the government of the Commonwealth of **the Philippine Islands.**chan robles virtual law library

**Sec. 16.** If any provision of this Act is declared unconstitutional or the applicability thereof to any person or circumstance is held invalid, the validity of the remainder of the Act and the applicability of such provisions to other persons and circumstances **shall not be affected thereby.**chan robles virtual law library

## Effective Date

**Sec. 17.** The foregoing provisions of this Act shall not take effect until accepted by concurrent resolution of the Philippine Legislature or by a convention called for the purpose of passing upon that question as may be provided by the Philippine **Legislature.**chan robles virtual law library

*Approved:* **March 24,1934.**



Find Your **Filipina Beauty** Today!

**FilipinaHeart.com**

THE CHAN ROBLES VIRTUAL LAW LIBRARY - QUICK GLANCE

Philippines| Worldwide|The Business Page

Main Indices of the Library --->                    `Go!`

Back to Top  -  Back to Main Index  -  Back to Home

| Copyright ©1998-2006 by ChanRobles Publishing Company *All Rights Reserved* | A production of The ChanRobles Group |
|---|---|
| **Questions and comments mailto:** cralaw@chanrobles.com **or** jgc@chanrobles.com | **Designed & Maintained by:** Harvard Computer Systems, Inc. |
| contents disclaimer    e-mail restriction | [Our site works best at 800x600 resolution with Netscape] |

Since 19.07.98


Find Your **Filipina Beauty** Today!
**FilipinaHeart.com**

# 7 FAM 1140

## ACQUISITION OF NON-CITIZEN U.S. NATIONALITY BY BIRTH ABROAD

# 7 FAM 1141  INTRODUCTION

a. The acquisition of non-citizen U.S. nationality by            is governed by treaty or congressional legislation.  The law in effect when a person was born governs that person's acquisition of non-citizen U.S. nationality, unless the legislation specifically provides otherwise such as retroactive application.  See 7 FAM 1120 regarding acquisition of U.S. nationality by birth in U.S. territories and possessions.  See 7 FAM 1330 regarding documentary evidence to establish a citizenship claim.

   (1)  The national or nationals through whom a child claims non-citizen U.S. nationality must have been U.S. non-citizen nationals when the child was born and previously must have resided or been physically present in the United States or one of its outlying possessions as required by the applicable law.

   (2)  See 7 FAM 1125 regarding acquisition of U.S. non-citizen nationality by persons born in American Samoa and Swains Island and 7 FAM 1126 regarding the non-citizen national option provided for persons born in the Commonwealth of the Northern Mariana Islands in Section 302 of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (Public Law 94-241. 90 Stat. 263)("Covenant") of March 24, 1976, entered fully into force November 3, 1986.

b.            : The considerations in 7 FAM 1131, relating to blood relationships, and 7 FAM 1161, concerning posthumous children also apply to persons claiming non-citizen U.S. nationality through their parents.

c.            : Persons who acquired non-citizen U.S. nationality at birth were never subject to special requirements for retaining their U.S. nationality.

d.                                     : A child born to one U.S. citizen parent and one U.S. non-citizen national

parent acquires U.S. citizenship if the parent meets the requirements of INA 301(d) (8 U.S.C. 1401(d)) (or prior statutes) and, in cases of children born out of wedlock, INA 309 (8 U.S.C. 1409) (or prior statutes. The person may not opt for U.S. non-citizen national status. A person cannot be both a citizen and non-citizen national. Non-citizenship nationality under Section 308 of the INA is only acquired when there is no U.S. citizen parent.

e.                                            : See INA 395 (8 U.S.C. 1502) and 22 CFR 50.10(a).

Only persons who acquired U.S. non-citizen national status pursuant to INA 308 (8 U.S.C. 1408) or Section 204 NA are eligible for such a certificate. The Department implements INA 359 (8 U.S.C. 1502) by annotating the person's U.S. passport to indicate that he or she is a non-citizen national and not a citizen, using endorsement code 09. (See 7 FAM Appendix B).

---

THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN.

:

---

f.                                            : A person who is a U.S. non-citizen national may apply for naturalization as a U.S. citizen pursuant to INA 325 (8 U.S.C. 1436) and 8 CFR 325.

| | | | | |
|---|---|---|---|---|
| On or after January 13, 1941 and prior to December 24, 1952 | In an outlying possession of the United States | One U.S. non-citizen national parent | | Section 204(a) of the Nationality Act |



**Cornell University**
**Law School**

Search Law School    Search Cornell

LII / Legal Information Institute

# U.S. Code collection

TITLE 8 > CHAPTER 12 > SUBCHAPTER III > Part I > § 1408

## § 1408. Nationals but not citizens of the United States at birth

Unless otherwise provided in section 1401 of this title, the following shall be nationals, but not citizens, of the United States at birth:

**(1)** A person born in an outlying possession of the United States on or after the date of formal acquisition of such possession;

**(2)** A person born outside the United States and its outlying possessions of parents both of whom are nationals, but not citizens, of the United States, and have had a residence in the United States, or one of its outlying possessions prior to the birth of such person;

**(3)** A person of unknown parentage found in an outlying possession of the United States while under the age of five years, until shown, prior to his attaining the age of twenty-one years, not to have been born in such outlying possession; and

**(4)** A person born outside the United States and its outlying possessions of parents one of whom is an alien, and the other a national, but not a citizen, of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than seven years in any continuous period of ten years—

**(A)** during which the national parent was not outside the United States or its outlying possessions for a continuous period of more than one year, and

**(B)** at least five years of which were after attaining the age of fourteen years.

The proviso of section 1401 (g) of this title shall apply to the national parent under this paragraph in the same manner as it applies to the citizen parent under that section.

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*



**Cornell University**
**Law School**

Search Law School    Search Cornell

LII / Legal Information Institute

# U.S. Code collection

TITLE 8 > CHAPTER 12 > SUBCHAPTER III > Part I > § 1401

## § 1401. Nationals and citizens of United States at birth

The following shall be nationals and citizens of the United States at birth:

**(a)** a person born in the United States, and subject to the jurisdiction thereof;

**(b)** a person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe: Provided, That the granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right of such person to tribal or other property;

**(c)** a person born outside of the United States and its outlying possessions of parents both of whom are citizens of the United States and one of whom has had a residence in the United States or one of its outlying possessions, prior to the birth of such person;

**(d)** a person born outside of the United States and its outlying possessions of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying possessions for a continuous period of one year prior to the birth of such person, and the other of whom is a national, but not a citizen of the United States;

**(e)** a person born in an outlying possession of the United States of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying possessions for a continuous period of one year at any time prior to the birth of such person;

**(f)** a person of unknown parentage found in the United States while under the age of five years, until shown, prior to his attaining the age of twenty-one years, not to have been born in the United States;

**(g)** a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years: Provided, That any periods of honorable service in the Armed Forces of the United States, or periods of employment with the United States Government or with an international organization as that term is defined in section 288 of title 22 by such citizen parent, or any periods during which such citizen parent is physically present abroad as the dependent unmarried son or daughter and a member of the household of a person

    **(A)** honorably serving with the Armed Forces of the United States, or

(B) employed by the United States Government or an international organization as defined in section 288 of title 22, may be included in order to satisfy the physical-presence requirement of this paragraph. This proviso shall be applicable to persons born on or after December 24, 1952, to the same extent as if it had become effective in its present form on that date; and

(h) a person born before noon (Eastern Standard Time) May 24, 1934, outside the limits and jurisdiction of the United States of an alien father and a mother who is a citizen of the United States who, prior to the birth of such person, had resided in the United States.

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*